UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10244-RGS

SEDOSOFT, INC.

v.

MARK BURCHETT LTD. and NFSx9 LLC

MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

December 9, 2016

STEARNS, D.J.

This is a case of a curdled collaboration.  In 2010, Mark Burchett Ltd.[1]

hired Sedosoft, Inc., to write computer code for a trading platform.  The

erstwhile colleagues now dispute their respective obligations under the

original code-writing agreement, including the rights to the custom trading

code and Sedosoft's "Rocket Trade" support code library.

BACKGROUND

Mark Burchett is a career stock trader.  Sean Donovan, the president

of Sedosoft, is a computer programmer with some trading experience.   In

January of 2010, Burchett, as the principal of Burchett Ltd., sought out

---

[1] NFSx9 LLC is the successor entity in all relevant respects to Burchett
Ltd.

Donovan and Sedosoft[2] to write computer code for a proprietary platform, to be called M.B.hybrid Trader.  Donovan signed a Confidentiality Agreement covering any of Burchett's confidential information to which he would have access.  *See* Defs.' Ex. 6 (Dkt. # 100-1 at 7-9).  Donovan offered to grant Burchett, in exchange for a payment of $2,500, a license to Sedosoft's "trading system support library."  Defs.' Ex. 4 (Dkt. # 100-1 at 2).

> This contains a number of C++ class modules and functions which create a general programming environment that is suitable for the development of electronic security trading system.  These routines have been developed over the years, have been tested and are the base for other projects that [Donovan has] done or currently work on.  The other alternative is that [Donovan] recreate what is required to support [Burchett's] project, this option will significantly impact time and cost of the project, however, you will own the full IP rights to the results.

*Id.*  "For the work for hire portion of this project,"[3] Donovan quoted an hourly rate of $95.  *Id.*  After learning more about Burchett's requirements,

---

[2] At the time the agreement was entered, Sedosoft's corporate registration had lapsed.

[3] A "work made for hire" (or a "work for hire" as a shorthand) is an exception to the general rule that the copyright of a work vests initially in the author.  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  Absent an agreement stating otherwise, the initial copyright of a work for hire vests in the person or entity commissioning the work.  *Id.*  17 U.S.C. § 101 defines two distinct categories of work for hire.

A "work made for hire" is –

(1)  a work prepared by an employee within the scope of his or her employment; or

Donovan estimated that the project would take a minimum of 21 days to a maximum of 35 days of code time start to finish, and settled on a "firm estimate" of 25 days, at 8 hours per day. Defs.' Ex. 5 (Dkt. # 100-1 at 4). Burchett agreed to these terms, and paid Donovan $24,000 in two installments.

For the next several months, Donovan (and another programmer he hired) worked on M.B.hybrid. In April, he emailed Burchett to ask about the form of a copyright notice to be included in the M.B.hybrid code: "Hi Mark: I'd like to include a copyright notice in your hybrid software to establish your rights to it. In order to do that I'll need to know the name of the entity that

───────────────────

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

3

will own it, be it your[self] personally or a company." Defs.' Ex. 9 (Dkt. # 100-1 at 30). Donovan eventually incorporated the notice, "Copyright ©2010, Mark Burchett Ltd. All Rights Reserved," in the M.B.hybrid code. Defs.' Ex. 10 (Dkt. # 100-1 at 34-37).

Although Donovan designed M.B.hybrid around his existing trading system support library to expedite the project, the code-writing time for M.B.hybrid far exceeded his "firm estimate." By October of 2010, he had spent approximately 530 hours on the task, *see* Pl.'s Ex. Q (Dkt. # 82-16) at 3-4, and had stopped expending any significant effort on its completion. In an email dated January 4, 2011, Burchett noted the difference between the fees Donovan had received and the fees he would have received, if computed according to his hourly rate, as approximately $30,000. *Id.* Burchett indicated that "[he was] agreeable to paying [Donovan's] entire billed amount, but out of earnings. The rate [he was] suggesting is 50% of the profits until [Donovan is] whole." *Id.* at 4.

Donovan considered Burchett's offer over the next two months. In mid-February of 2011, he detailed the ongoing problem of underestimating the amount of time required to complete various aspects of M.B.hybrid.

> Last year when we started speaking one of the first things you said to me was "I'll pay you for your time, no haircut." I've reviewed the emails from that period and, as you were quick to point out, I made, at your prompting, a firm time commitment.

Which I have subsequently honored, despite having put in twice
the time on many things which were not covered in the original
bid.  Fine, I can live with such things.  I made a mistake, but, I
have fulfilled my commitment to you.

. . .

At the time of [Burchett's profit-sharing] proposal it looked to me
that there was about 2 to 3 weeks of work to do.  1-2 weeks of
working on the execution engine and a few days to integrate with
the hybrid.  Well, we've seen what happened with my estimate
for the execution engine.  We are at week 10 and all I have is a
stripped down version of what I wanted to accomplish.

. . .

This weekend I was trying to figure out how best to integrate the
hybrid with either the existing AXE using its implementation of
Limit, Market and specialty order types or how I'd do it with the
new AXE (AXE 2.0).  And, it looks a good bit more complicated
than I originally thought, some of the core order processing logic
in the hybrid server needs to be rewritten.  So, my conservative
estimate is 2 to 3 weeks of additional time to complete the hybrid
portion.

Defs.' Ex. 19 (Dkt. # 100-2 at 42-43).  Given his other time commitments,

Donovan doubted he could ever complete the M.B.hybrid code.  *Id.*  In March

of 2011, Donovan rejected Burchett's "make whole" proposal.  "All of your

offers were based on the same premise of me providing services to be paid

for out of your future profits, if there are any.  I am not interested in a deal

which is structured in that form.  If you'd like me to perform additional work

on your project the rate is $125/hr."[4]  Defs.' Ex. 14 (Dkt. # 100-2 at 10).

---

[4] Donovan also complained that a January 2011 bill had gone unpaid.
Burchett subsequently remitted payment.

Following these exchanges, Donovan did no substantive work on M.B.hybrid for the remainder of 2011 and 2012.  In September of 2012, he wrote to Burchett that "[a]fter sleeping on it, I'm out . . . I'll get you a copy of the source and you two and do the best you can with it.  I'm happy to answer clarifying questions and give the occasional point, provided it is on my time." Defs.' Ex. 11 (Dkt. # 100-1 at 39).  Donovan sent Burchett a zip file identified MarkB.zip, containing the source code for M.B.hybrid and executable versions of pre-existing Sedosoft components called AXE and QUO.[5]  With respect to the latter, Donovan stated that "[he]'ll be keeping the source to AXE and QUO, you'll have to implement work around in the long term. Meantime you can use them with the current license files (I forget the term but I'll renew as long as you need it)."  *Id.*

Vlad Didenko, with whom Burchett had founded NFSx9, took over the development of M.B.hybrid, consulting occasionally with Donovan. Donovan provided Burchett with the license files to access the AXE and QUO components through the end of 2014.  In December of 2014, he informed Burchett and NFSx9 that Sedosoft would henceforth charge a $2,000-a-month license fee for the use of these components.  Burchett and NFSx9

---

[5] Generally speaking, source code is the human-readable version of instructions for a computer program.  An executable is a compiled machine-readable version of the program.

refused to pay, contending that the components were part of the support libraries for which they had acquired (for $2,500) a perpetual license. *See* Second Am. Compl. Ex. D.  Donovan cut off NFSx9's access to the components.

On February 2, 2015, Donovan brought this lawsuit seeking declaratory judgment of the parties' rights to the M.B.hybrid code and Sedosoft components.  On February 6, 2015, Donovan filed two registrations with the United States Copyright Office.  Registration number Txu 1-947-242, entitled "Rocket Trade (TM) Algorithmic Trader Development Support Code," copyrighted the source code for certain Sedosoft components, including AXE and QUO.  As allowed by the Copyright Office, Donovan submitted the first and last 25 pages of the Rocket Trade code.  Registration number Txu 1-947-243, entitled "Hybrid Trader Software," copyrighted the M.B.hybrid code.  Donovan submitted the entirety of the M.B.hybrid code to the Copyright Office.

In July of 2015, Donovan amended his Complaint to add claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Burchett Ltd. (Counts II and III); breach of contract against NFSx9 (Count IV); and infringement of the two copyright registrations (Counts V and VI).  Burchett Ltd. and NFSx9 answered and counterclaimed

for breach of contract with respect to M.B.hybrid (CC Count I) and the Sedosoft library license (CC Count II); fraud (CC Count III) and misrepresentation (CC Count IV) (with respect to the ownership of the M.B.hybrid code); violation of the Massachusetts Unfair Trade Practices statute, Gen. Laws ch. 93A (CC Count V); fraud with respect to the Sedosoft library license (CC Count VI); declaration of non-infringement of the Sedosoft library (CC Count VII); unjust enrichment (CC Count VIII); estoppel (CC Count IX); declaration of implied license to the Sedosoft library (CC Count X); declaration of implied license to M.B.hybrid (CC Count XI); and breach of a confidentiality agreement (CC Count XII).   Having completed fact and expert discovery, Sedosoft moves for partial summary judgment on Counterclaims Counts I-V, VIII-IX, and XII.  Defendants cross move for a brevis judgment on Counts I-III, V-VI, Counterclaim Count XII, and a determination that Donovan entered into the January of 2010 code-writing agreement as an individual.[6]

---

[6] Sedosoft does not dispute that its corporate charter had lapsed at the time of the January of 2010 agreement, and that as a result Donovan entered into the agreement as an individual.  Rather, Sedosoft contends that this does not alter the fact that M.B.hybrid was not a work for hire because Donovan was not Burchett's employee, and because software is not a statutorily designated work for hire genre.  *See* Note 3, *supra*.

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

*Breach of the January of 2010 Agreement*

Although the parties agree that they entered into a binding and enforceable contract in January of 2010, they dispute its terms and each side accuses the other of breaching the agreement. Sedosoft claims that Burchett failed to fully pay for Donovan's work. According to Sedosoft, it (Donovan) was to be paid for M.B.hybrid coding work on an hourly basis, and based on the total number of hours expended by Donovan (and his associate), it is owed approximately $34,000. Sedosoft cites the January 4, 2011 email in

9

which Burchett acknowledged that Donovan had devoted approximately 530 hours to the project, and that the difference between the value of that time computed at Donovan's hourly rate and the payments Burchett had made was approximately $30,000.  In addition, Sedosoft asserts that even if the original contract is construed as setting out a fixed price, Burchett had requested so many changes outside of the original scope of the agreement as to modify its terms.

Defendants counter that Donovan, by giving a "firm estimate," Defs.' Ex. 5, an amount that has been paid, has no contractual recourse. Defendants also argue, and the court agrees, that Burchett did not make a binding promise to pay Sedosoft an additional $30,000.  Although Burchett offered to compensate Donovan for the additional hours out of future profits, Donovan refused the offer, and moreover, relinquished any claim to additional hour-based payments for the work he had performed prior to February of 2011.  In his February 14, 2011 email to Burchett, Donovan acknowledged that

> [he] made . . . a firm time commitment.  Which I have subsequently honored, despite having put in twice the time on many things which were not covered in the original bid.  *Fine, I can live with such things.*  I made a mistake, but, I have fulfilled my commitment to you.

Defs.' Ex. 19 (emphasis added).  The record further reflects that Donovan performed little, if any, work on M.B.hybrid after this time.  Because there is no evidence that Burchett Ltd. owes any sum of money to Sedosoft under the January 2010 contract, the court will <u>ALLOW</u> defendants' motion for summary judgment on Counts II and III.

For their part, defendants allege that Donovan failed to keep his end of the bargain as he never finished the M.B.hybrid project and reneged on the granting of a perpetual license to his trading support system library. Donovan responds that he came close enough by delivering a working prototype of M.B.hybrid, and that the critical Rocket Trade components such as AXE and QUO were not included in the licensed library.  He also suggests that he had provided the Rocket Trade license through 2014 as a courtesy, and that it was always understood by the parties that M.B.hybrid's dependency on Rocket Trade would necessarily end at some point.

Defendants argue, and the court agrees, that their claims of a breach of contract are sufficiently supported to be decided by a jury.  With respect to completing M.B.hybrid, Donovan has not proffered documentation of the original specifications requested by Burchett, or the functionality of the code Donovan completed.  Defendants cite to Donovan's deposition testimony that M.B.hybrid remains uncompleted "to this day."  Defs.' Ex. A (Dkt. # 97)

at 186.   Defendants also point out that in a February 19, 2011 email to Burchett, Donovan admitted that he had not implemented limit orders and that "[he had] made a number of promises to [Burchett] that [he was] unable to keep as they are unrealistic."  Defs.' Ex. G (Dkt. # 98-4).

With respect to the support library license, defendants note that Donovan did not reference Rocket Trade prior to or during the formation of the January 2010 agreement, and only begin using the trade name internally sometime in 2011.   Defendants further note that Burchett expressly requested that Donovan not make M.B.hybrid dependent on other external code, but that Donovan had nonetheless incorporated the Rocket Trade components "out of development convenience."  Defs.' Ex. 3 (Dkt. # 100 at 9-40) at 166.  Donovan did not request a fee for the use of these components until the end of 2014, and the request contradicted the assurance he gave when turning the M.B.hybrid code over to Burchett and Didenko in 2012 that "[he]'ll renew [the license] as long as [they] need it."  Defs.' Ex. 11.  Because the record raises genuine disputes of fact as to Sedosoft's performance under the contract, the court will <u>DENY</u> Sedosoft's motion for summary judgment on Counterclaims Counts I & II.[7]

---

[7] The court will dismiss Counterclaims Counts III, IV, and VI, as the alleged fraud and misrepresentation with respect to the ownership of the M.B.hybrid code and the scope of the paid-for license are issues to be settled

*Copyright Infringement*

Defendants contend, and the court agrees, that Sedosoft is estopped from asserting copyright infringement claims against them because Donovan, expressly and by his conduct, permitted defendants to use the M.B.hybrid code and the Rocket Trade components.

> [W]hen a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception, the doctrine of estoppel may bar the copyright owner's claims completely, eliminating all potential remedies.  *See* 6 Patry § 20:58, at 20-110 to 20-112. . . . The gravamen of estoppel, a defense long recognized as available in actions at law, *see Wehrman v. Conklin,* 155 U.S. 314, 327 (1894), is misleading and consequent loss, *see* 6 Patry § 20:58, at 20-110 to 20-112.  Delay may be involved, but is not an element of the defense.

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977 (2014).  The elements of equitable estoppel are:

> "(1) the party to be estopped must know the facts; (2) that party must intend that his conduct be acted upon (or must act in a way that leads the party asserting the estoppel to believe it is so intended); (3) the latter must be ignorant of the true facts; and (4) he must rely on the estopping conduct to his detriment."

*Plumley v. S. Container, Inc.*, 303 F.3d 364, 374 (1st Cir. 2002).

---

in this case.  The court will also dismiss Counterclaim Count VIII for unjust enrichment because defendants have pled an adequate remedy at law (breach of contract).

There is no question that Donovan knew, when he gave the M.B.hybrid code and the executable versions of AXE and QUO to Burchett and Didenko in September of 2012, that they intended to continue to develop the code. *See* Defs.' Ex. 11 (Donovan "want[ed] [Burchett and Didenko] to have great success with [their] trading venture."). Donovan also knew of M.B.hybrid's dependency on the AXE and QUO components because he specifically designed the code around these components.

Donovan also intended that Burchett and Didenko rely on his encouragement to continue developing the M.B.hybrid code. "I'll get you a copy of the source and you two [] do the best you can with it. I'm happy to answer clarifying questions and give the occasional point, provided it is on my time." *Id.* With respect to AXE and QUO, although Donovan agreed that the dependency should eventually be severed, he did not set a deadline for doing so and stated "[he]'ll renew [the license files] as long as you need it." *Id.*

It is also apparent that Burchett and Didenko did not become aware of Donovan's claim to the M.B.hybrid until this litigation was initiated. From the outset, Donovan had represented that his work on the custom code was "work for hire." Defs.' Ex. 4. He had placed Burchett Ltd.'s copyright notice in the body of the code, which notice is still part of the code submitted to the

14

Copyright Office.  When he turned over the source code in September of 2012, he placed no limitations on defendants' use of the code.  Burchett and Didenko also did not know of Donovan's intention to charge a monthly license fee for AXE and QUO until he announced it in December of 2014.

Defendants also undeniably relied on Donovan's representations. Burchett paid Donovan for his work on the understanding that Burchett Ltd. would own the M.B.hybrid code.  From September of 2012 onward, Burchett and Didenko invested time and energy in the development of the M.B.hybrid code, relying on their belief of ownership and Donovan's promise to renew the AXE and QUO licenses "as long as [they] need[ed] it."  Donovan's words and actions granted defendants, at least, an implied license to work on M.B.hybrid using Rocket Trade components.  Consequently, Sedosoft is estopped from claiming copyright infringement of these two code bodies, and the court will <u>ALLOW</u> defendants' motion for summary judgment on Counts V and VI, and <u>DENY</u> Sedosoft's motion for summary judgment on Counterclaim Count IX.

*Breach of the Confidentiality Agreement*

Defendants allege that Sedosoft breached the January 2010 Confidentiality Agreement when Sedosoft submitted the entire M.B.hybrid code to the Copyright Office, making the code and its proprietary trading

techniques publically accessible.   Sedosoft denies liability, arguing that M.B.hybrid does not contain any confidential information belonging to defendants because all of the trading techniques recorded in the code are publically known.   The parties' dueling expert reports stake out, unsurprisingly, opposing positions as to whether M.B.hybrid includes proprietary trading techniques, and thus raise an issue of fact to be decided by a jury.   The cross-motions for summary judgment on Counterclaim XII will therefore be <u>DENIED</u>.[8]

ORDER

For the foregoing reasons, Sedosoft's motion for summary judgment is <u>ALLOWED</u> as to Counterclaims Counts III, IV, VI, and VIII, and <u>DENIED</u> as to Counterclaims Counts I, II, V, IX, and XII.   Defendants' cross-motion is <u>ALLOWED</u> as to Counts II, III, V, and VI, and <u>DENIED</u> as

---

[8] The court will also deny Sedosoft's motion as to Counterclaim Count V of unfair and deceptive business practices under Chapter 93A.   Although "the mere breach of a contract, without more, does not amount to a c. 93A violation," *Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762 (1989), here the record raises the question of whether Sedosoft intentionally and maliciously disclosed defendants' proprietary trading techniques.   For its Rocket Trade registration, Sedosoft availed itself of the Copyright Office procedure permitting the deposit of only the first and last 25 pages of software code.   In contrast, Sedosoft submitted the entirety of the M.B.hybrid code.

to Counterclaim Count XII.  The Clerk will schedule the case to be tried before a jury.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE